OTTERBOURG, STEINDLER, HOUSTON
  & ROSEN, P.C.
Attorneys for Plaintiffs
230 Park Avenue
New York, New York
(212) 661-9100
Bernard Beitel (BB 8832)
Lloyd M. Green (LG 9140)


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

LOWER MANHATTAN DIALYSIS CENTER, INC., :  07 Civ. 06903 (DLC)
L-M DIALYSIS CORPORATION, LANTZ-
MATALON CHINATOWN ASSOCIATES, INC., :
and CHINATOWN DIALYSIS CENTER, L.L.C.,

                                 :

                    Plaintiffs,    :   **DECLARATION OF**

                                  :   <u>**ROBERT MATALON**</u>

   - against -

                                  :

JOHN P. LANTZ, M.D. and MARIE LANTZ,

                                :

                Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


       Pursuant to 28 U.S.C. § 1746, Robert Matalon, M.D. declares under penalty of

perjury:

       1.     I am the President, Chief Executive Officer and Medical Director of Lower

Manhattan Dialysis Center, Inc. ("*LMDC*") and L-M Dialysis Corporation ("*L-M*"), the

President and Chief Executive Officer of Lantz-Matalon Chinatown Associates, Inc.

("*LMCA*"), and a Medical Director, President and senior executive of Chinatown Dialysis

Center, LLC ("*CDC*"), the Plaintiffs in the within action.  I am fully familiar with the facts set

forth herein.  I submit this Declaration in reply to the Declaration of Marie Lantz (*"**Lantz***

***Declaration***") and in further support of Plaintiffs' motion to remand this case to the Supreme

Court of the State of New York, County of New York.

     2.     This motion deals with the absence of subject matter jurisdiction.  Therefore, I

will not address the allegations in the Lantz Declaration regarding the events surrounding her

voluntary and willing execution on May 20, 2007 of a document annexed to the Complaint as

Exhibit A and referred to in the Complaint as the "Shareholders Agreement."  I also will not

address, in this Declaration, issues regarding reimbursement for health insurance premiums or

disputes regarding contacts with Plaintiffs' staff as alleged in the Complaint.  Suffice it to

state that there are factual differences in respect of the events described in the Lantz

Declaration, which will be dealt with once the issue of jurisdiction is resolved.

     3.     This Declaration will reply to the statements in the Lantz Declaration that

attempt to (a) cast doubt on Dang Dang Nguyen, M.D.'s (*"**Dr. Nguyen***") status as a member

of CDC, and (b) depict CDC as merely a "nominal or formal" party to this action.  As

Plaintiffs will demonstrate by overwhelming documentary proof, Dr. Nguyen, in

consideration for an investment of $133,000, became a 10% member in CDC with the

approval of my colleague and business associate, defendant John P. Lantz, M.D ("Lantz"),

who unfortunately is now seriously ill and incapable of acting.  Further, documentary proof

annexed hereto will demonstrate the significant financial stake of CDC in the consummation

of the transaction described in the Shareholders Agreement and the necessity for declaratory

relief rejecting Defendants' unjustifiable attempt to rescind the Shareholders Agreement and

deprive CDC of approximately $4 million to remove and relocate its medical facility.

4.      On May 8, 2001, Lantz, as corporate secretary of LMDC, certified that the

LMDC Board of Directors, of which I am a member, among other things, resolved that:

> The Corporation will pursue entering into arrangements and
> transactions involving the Corporation and Dang Dang Nguyen,
> M.D. ("Nguyen") pursuant to which Chinatown Dialysis Center
> would become part of a separate organization in which Nguyen
> would maintain a ten (10%) percent minority ownership
> interest.

A copy of the certified resolution is annexed hereto as Exhibit 1. I do not know whether or

not Lantz told his wife, defendant Marie Lantz ("*Marie*") about the prospective arrangements

with Dr. Nguyen. In any event, Marie's knowledge of Dr. Nguyen's interest is irrelevant in

these proceedings.

5.      On May 1, 2001, a Master Agreement was entered into between LMDC and

Dr. Nguyen. A copy of the Master Agreement without exhibits is annexed hereto as Exhibit

2. The Agreement sets forth the terms under which Dr. Nguyen would receive a 10 percent

membership interest in CDC "following the receipt by CDC of final regulatory approval"

from the New York State Department of Health to own and operate a diagnostic and treatment

center. Simultaneously, an Assignment and Assumption of Membership interest was signed

by LMDC and Dr. Nguyen (Exhibit 3). The Assignment reflected Dr. Nguyen's New Jersey

residence address. Further, at the same time, LMDC and Dr. Nguyen executed a Limited

Liability Company Operating Agreement.

6.      The Lantz Declaration, signed on September 4, 2007, states (¶ 23) that the

"first notice" she received that "anyone besides LMDC was the owner of CDC" was when she

saw the Complaint. Her statement is surprising in view of the fact that on June 28, 2007, over

four weeks before the issuance of the Complaint, Miriam Sinitzky, the administrator for each

of the Plaintiffs and the chief operating officer of LMDC, L-M and CDC, sent John

Manfredonia, Esq., one of the Defendants' attorneys, in response to his specific request,

copies of corporate tax returns filed for 2004, 2005 and 2006 and a number of certified

financial statements. The returns and statements are listed on the schedule attached to a June

28, 2007 e-mail from one of Plaintiffs' attorneys, Arthur Katz, to Mr. Manfredonia (Exhibit 4

annexed hereto).

      7.     The 2004, 2005 and 2006 consolidated financial statements of LMDC,

certified by an independent auditor, consisted of a consolidated balance sheet of LMDC and

CDC as of December 31 of each year, and the related consolidated statements of operations,

comprehensive income and cash flow for the year then ended. Note 1 of each of the three

LMDC financial statements sent to Mr. Manfredonia on June 28, 2007 state, among other

things, that:

> The financial statements consist of Lower Manhattan Dialysis
> Center, Inc. (LMDC) and Chinatown Dialysis Center, LLC
> (CDC). Both LMDC and CDC (the Centers) operate as
> outpatient dialysis facilities.
>
>      *     *     *
>
> CDC provides life-sustaining hemodialysis to approximately
> one hundred and fifty patients in the Chinatown area generally
> three times per week …
>
> CDC is owned ninety percent by LMDC and ten percent by a
> minority interest. (Emphasis supplied.)

A copy of the cover page, the Table of Contents, the Independent Auditor's Report, issued on

April 6, 2007 and page 1 of the Notes to the December 31, 2006 Financial Statements is

annexed hereto as Exhibit 5. Thus, Defendants' attorneys were advised as early as June 28,

2007 of the existence of a 10 percent minority interest in CDC.

8.    On December 31, 2002, LMCA and CDC entered into an agreement of sublease (Exhibit 6 annexed hereto, redacted to remove certain proprietary information). That document provided that LMCA, as prime tenant for premises at 9-11 Crosby Street, New York, New York ("*Premises*"), sublet the Premises, effective April 3, 2003 to CDC. The lease runs to 2018.

9.    As alleged in the Verified Complaint, about two years ago, the owner of the Premises advised the Plaintiffs of a desire to cancel the lease to the Premises, cancel the Sublease to CDC and regain possession of the Premises. My objective thereafter, in negotiating with the owner of the Premises, was to obtain a fair price for cancellation of a lease which had an additional ten years to run and to obtain sufficient funds to relocate to acceptable space in the Chinatown area of New York City. The agreement of both LMCA, as tenant, and CDC, as subtenant, was essential to the consummation of a transaction to cancel the Lease. Once I was satisfied that I had negotiated a fair price of $15 million for cancellation of the Lease and Sublease, which would make available approximately $4 million to relocate the operations of CDC, I set out to consummate the transactions. First, I informed Marie and her adult children, both physicians, about the terms of the proposed transactions and then, following normal corporate protocol, obtained Marie's approval, as attorney-in-fact for Lantz as a shareholder of LMDC, L-M and LMCA. I then proceeded to conclude the lease cancellation transactions.

10.    On June 12, 2007, prior to signing the necessary agreements to cancel the Lease and Sublease, one of Plaintiffs' attorneys, Arthur Katz, sent Defendants' attorney, Jerome A. Deener, as attachments to an e-mail (Exhibit 7), a copy of what was essentially the

final version of the documents that were ready to be executed in connection with the cancellation of the Lease and Sublease, namely:

(a)    "Notice of Petition Holdover" in an action to be filed in the Civil Court of the City of New York, County of New York, Non-Housing Part 52. The parties to the holdover proceeding were Petitioner-Landlord, the owner of the Premises, LMCA as Respondent-Tenant and CDC as Respondent-Subtenant. The notice was to bring on a hearing before the Civil Court for a "final judgment of eviction" in respect of the Premises. Attached to the Notice was the Landlord's Petition and a Stipulation of Settlement (*"Stipulation"*) between the Landlord, LMCA and CDC. The Stipulation recited that LMCA and CDC, among other things, consent to "the issuance of entry of a final judgment of possession in favor of Landlord," with execution of the Warrant of Eviction to be stayed until December 5, 2008.

(b)    A Settlement and Surrender Agreement between the Landlord, LMCA, as Tenant, and CDC, as Subtenant, which provided that, in exchange for a payment of $15 million to LMCA, the Lease and Sublease will be cancelled as of June 29, 2007, with the Premises to be delivered to the Landlord "vacant and unencumbered" on or before December 5, 2008.

(c)    An Escrow Agreement providing for the deposit with an Escrow Agent of a letter of credit to ensure the payment of an $8 million balance due for the lease cancellation, payable at the time of the surrender of the Premises.

(d)    A draft of the proposed letter of credit.

11.    The documents sent to Defendants' attorneys on June 12, 2007 clearly demonstrate that CDC was a necessary party to the agreement to cancel the Lease and Sublease and vacate the premises on or before December 5, 2008.

12.    On June 26, 2007, after Defendants' attorney reviewed the agreements and concluded the discussion of the transaction with Plaintiffs' attorneys handling this transaction, I executed the Settlement and Surrender Agreement on behalf of LMCA and CDC. As a result, on June 26, 27 and 28, 2007, LMCA received the following: (a) a refund of a $50,000 rental security deposit, (b) a waiver by the Landlord of any further obligations for LMCA and CDC to pay rent or other amounts under the Lease for the use and occupancy of the premises through and including December 5, 2008, which the parties to the transaction agreed had an imputed value of $305,154, (c) $100,000, (d) a wire transfer of $6,594,846, and (e) the commitment, supported by a letter of credit, to receive an additional $8,000,000 on or before the date the Premises are vacated. Significantly, no attempt was made by Defendants to rescind the Shareholders Agreement consenting to the cancellation of the Lease prior to execution by LMCA and CDC on June 26, 2007 of the agreements requiring the Premises to be vacated by December 5, 2008.

13.    Three weeks later Plaintiffs' attorney, Arthur Katz, received a letter from Defendants' attorney, Jerome Deener, Exhibit B annexed to the Complaint, which among other things, demanded 50 percent of $6,744,846 by no later than July 27, 2007 and threatened that failing to do so would result in a suit being immediately filed in Superior Court, Bergen County, State of New Jersey. Compliance with the demands by Defendants' attorney would prohibit the use of any funds for the "relocation, renovation and re-equipping" of CDC. Defendants' demands were intolerable and this action was instituted to seek

appropriate judicial relief permitting the Plaintiffs, including CDC, to continue their profitable business activities, with due regard to the interests of all stockholders and members, but without the unjust restrictions demanded by Defendants.

I declare under the penalty of perjury that the foregoing is true and correct. Executed this 17th day of September, 2007, at New York, New York.

_____

Robert Matalon, M.D.

# EXHIBIT 1

**RESOLUTIONS**
**OF**
**THE BOARD OF DIRECTORS**
**OF**
**LOWER MANHATTAN DIALYSIS CENTER, INC.**

**AT THE MEETING HELD ON MAY 8, 2001**

The Board of Directors (the "Board") of Lower Manhattan Dialysis Center, Inc., (the "Corporation"), consisting of the two shareholders of the Corporation, John P. Lantz, M.D., and Robert Matalon, M.D. has reviewed, approved and resolved the following:

The Corporation will pursue entering into arrangements and transactions involving the Corporation and Dang Dang Nguyen, M.D. ("Nguyen") pursuant to which Chinatown Dialysis Center would become part of a separate organization in which Nguyen would maintain a ten (10%) percent minority ownership interest.

The Corporation will pursue entering into arrangements and transactions involving the Corporation, and University Nephrology Associates ("UNA") and its partners, pursuant to which the 34th Street facility of the Corporation would become part of a separate organization in which UNA, or its partners, would maintain an aggregate ten (10%) percent minority ownership interest. Additionally, UNA, or its partners, would be granted an option to acquire up to a five (5%) percent minority ownership interest in the operator of the Chinatown Dialysis Center facility following the completion of the Nguyen transactions discussed above.

The Corporation will pursue entering into arrangements and transactions pursuant to which Miriam Sinitzky ("Sinitzky") would be given a ten (10%) percent non-voting, minority ownership interest in the Corporation, and, to the extent applicable, would receive from the Corporation a one time bonus in an amount equal to any tax liability incurred by Sinitzky in connection with her receipt of such interest.

The Corporation will pursue entering into arrangements and transactions involving the Corporation and NYU School of Medicine and/or NYU Medical Center ("NYU") whereby NYU would purchase a ten (10%) percent ownership interest in the 34th Street facility.

The appropriate officers and representatives of the Corporation are directed to engage in such actions, and to execute and deliver such documents, as in their reasonable opinion may be necessary or appropriate to effect the development, finalization and implementation by the Corporation of each of the matters discussed above.

**CERTIFICATION**

I, John P. Lantz, M.D., Secretary of the Corporation, hereby certify that the above Resolutions were adopted unanimously at a meeting of the Board of Directors of Lower Manhattan Dialysis Center, Inc., on May 8, 2001.

*signed before me 8th day of May 2001*

*Myrna O. Dain*
MYRNA O. DACILLO
Notary Public, State of New York
No. 31-5069445
Qualified in New York County
Commission Expires 11/25/2002

_____
John P. Lantz, M.D., Secretary

# EXHIBIT 2

## MASTER AGREEMENT

THIS MASTER AGREEMENT is made and effective as of the 1st day of May, 2001 (the "Effective Date") by and between LOWER MANHATTAN DIALYSIS CENTER, INC. ("LMDC"), a New York corporation with an address at 323 East 34th Street, New York, New York 10016, and Dang Dung Nguyen, M.D., ("Nguyen"), an individual residing at 7 Aspen Court, Warren, New Jersey 07059.

WHEREAS, LMDC is a New York business corporation certified as a diagnostic and treatment center under Article 28 of the New York State Public Health Law ("Article 28");

WHEREAS, LMDC currently operates a twenty-one (21) station chronic renal dialysis center at 150 Lafayette Street, New York, New York (the "Center");

WHEREAS, the parties mutually desire to participate in the various agreements and transactions described herein with respect to the ownership and operation of the Center; and

WHEREAS, the parties desire to set forth their mutual understandings and intentions with respect to such agreements and transactions.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and pursuant to the terms and conditions set forth below, the parties hereby agree as follows:

1.  <u>Definitions</u>.  For purposes of this Agreement, except as otherwise expressly provided herein and unless the context otherwise requires, the following terms defined in this Paragraph 1 shall have the meanings ascribed to them herein:

(a) "Affiliate" shall mean (i) any entity directly or indirectly controlling, controlled by, or under common control with, Nguyen or any family member of Nguyen, (ii) any entity in which Nguyen or any family member of Nguyen maintains, either directly or indirectly, any ownership, equity or governance interest, and (iii) any officer, manager, employee, partner, shareholder, member or other owner of any entity described in subparagraphs (i) or (ii) above, and any family member of any of the foregoing; provided that, as used in the foregoing definition of the term "Affiliate," the term "control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity, whether through corporate membership, ownership of voting securities, by contract or otherwise.

(b) "Application" shall mean the certificate of need application described in Paragraph 3(a) hereof.

(c) "Article 28" shall mean Article 28 of the New York State Public Health Law.

2

(d)  "Assignment Agreement" shall mean the assignment and assumption agreement executed between LMDC and Nguyen as of the date hereof and described in Paragraph 2(b)(i) hereof, a copy of which is attached hereto as Exhibit 1.

(e)  "Chinatown Dialysis Center, LLC" or "CDC" shall mean the New York limited liability company formed and organized in accordance with the provisions of this Agreement in connection with the proposed transfer of the ownership and operation of the Center.

(f)  "Center" shall mean the twenty-one (21) station chronic renal dialysis center currently owned and operated by LMDC, located at 150 Lafayette Street, New York, New York.

(g)  "Department" shall mean the New York State Department of Health.

(h)  "Escrow Agent" shall mean Richard Stoll, Esq., attorney for Nguyen, with an address at 350 Broadway, Suite 1207, New York, New York 10013.

(i)  "Escrow Agreement" shall mean the escrow agreement executed between LMDC, Nguyen and the Escrow Agent, as more specifically described in Paragraph 2(c) hereof.

(j)  "Escrow Amount" shall mean the sum deposited by Nguyen with the Escrow Agent in accordance with Paragraph 2(c)(i) hereof and subsequently forwarded by the Escrow Agent to CDC as a capital contribution of Nguyen in accordance with Paragraph 2(c)(ii) hereof.

3

(k) "CDC Operating Agreement" shall mean the Operating Agreement of CDC described in Paragraph 2(b)(ii) hereof and attached hereto as Exhibit 2.

(1) "Restricted Area" shall mean the area within Manhattan located south of a line extending west to east, from the Hudson River along Christopher Street to West 4th Street to East 4th Street to the East River, inclusive of the foregoing thoroughfares, as depicted graphically on the diagram attached hereto as Exhibit 5 and made a part hereof.

(m) "Nguyen Membership Interest" shall mean the aggregate ten (10%) percent membership interest in CDC transferred by LMDC to Nguyen pursuant to the Assignment Agreement, as described in greater detail in Paragraph 2 hereof.

2. Organization of CDC; Sale of Membership Interest to Nguyen.

(a) The parties hereby acknowledge that LMDC has caused to be formed and organized a New York limited liability company ("CDC"), for the purpose of transferring to CDC, pursuant to the further provisions of this Agreement and subject to the receipt of all requisite regulatory approvals, the ownership and operation of the Center.

(b) Simultaneously with the execution of this Agreement:

(i) LMDC shall transfer to Nguyen, pursuant to an assignment and assumption agreement substantially and materially similar to the Assignment and Assumption Agreement attached hereto as Exhibit 1 and made a part hereof (the "Assignment Agreement"),

4

ten (10%) percent of the aggregate membership interests of CDC (the "Nguyen Membership Interest"); and

(ii) LMDC and Nguyen shall execute the Operating Agreement of CDC in form substantially and materially similar to the proposed Operating Agreement of CDC attached hereto as Exhibit 2 and made a part hereof (the "CDC Operating Agreement").

(c) The parties acknowledge and agree that:

(i) simultaneously with the execution of this Agreement, the CDC Operating Agreement and the Assignment Agreement, Nguyen has deposited with Richard Stoll, Esq. (the "Escrow Agent"), as escrow agent, the sum of $133,000 (the "Escrow Amount"), in accordance with the terms and provisions of the escrow agreement attached hereto as Exhibit 3 and made a part hereof (the "Escrow Agreement"), which Escrow Amount represents the amount to be contributed to CDC as the capital contribution of Nguyen in accordance with the applicable provisions of the CDC Operating Agreement;

(ii) following the receipt by CDC of final regulatory approval of the Application and each of the matters described in Paragraph 3(a) hereof, and pursuant to the terms and provisions set forth in the Escrow Agreement, the Escrow Agent shall be instructed to forward to CDC the entire Escrow Amount (excluding any accrued interest thereon), and the parties shall cause the Escrow Amount to be deposited with CDC as a capital contribution of Nguyen.

(d)   The parties acknowledge and agree that the Escrow Amount (and the capital contribution of Nguyen to the Company in the amount of the Escrow Amount), represents the fair market value of the ten (10%) percent ownership interest in the Center to be acquired by Nguyen in accordance with the terms and provisions hereof, as determined by the firm of Margolin, Winer & Evens, LLP (the "Appraisers") in its report regarding the Center dated October 26, 2000 and attached hereto as Exhibit 4 and made a part hereof. The parties further acknowledge and agree that they have read the report of the Appraisers in its entirety, that they are satisfied with the contents thereof, and that they agree to be bound by the valuation set forth therein.

(e)   As more specifically described herein and in the CDC Operating Agreement, the parties acknowledge and agree that:

(i) LMDC and Nguyen shall be the members of CDC.

(ii) LMDC shall possess a ninety (90%) percent ownership interest in CDC, and Nguyen shall possess a ten (10%) percent ownership interest in CDC;

(iii) CDC shall be managed by its members in accordance with the terms and provisions of the CDC Operating Agreement, provided that, unless otherwise specifically required by applicable law, the members of CDC shall vote in proportion to the amount of their respective ownership interests, so that LMDC shall maintain ninety (90%) percent of the aggregate voting rights of CDC, and Nguyen shall maintain ten (10%) percent of the aggregate voting rights of CDC;

6

(iv) the transfer (as described in Paragraph 3(a)(iii) hereof) by LMDC to CDC, following the receipt of all appropriate regulatory approvals, of certain assets of the Center relating to the operation of the Center (which assets are listed on Exhibit 6 attached hereto and made a part hereof, and include, without limitation, the goodwill associated with the Center), shall represent the capital contribution of LMDC to CDC; and

(v) for purposes of this Agreement and the CDC Operating Agreement, the in-kind capital contribution described in subparagraph (iv) immediately above shall have a value of $2,080,000, which sum represents the entire fair market value of the Center, as determined by the Appraisers.

(f) The parties acknowledge and agree that, immediately following the receipt by CDC of final regulatory approval to operate the Center, CDC shall assume (whether by execution of counterpart agreements or otherwise): (i) as an "Obligor" thereunder (including, without limitation, as a borrower, guarantor or otherwise), any and all obligations, and any and all liabilities which then remain outstanding, under the Loan and Security Agreement, dated as of December 30, 1999, by and between Citibank, N.A. ("Citibank"), LMDC and certain other obligors (the "Loan Agreement"), (ii) any and all obligations, and any and all liabilities which then remain outstanding, under the Promissory Note and General Security Agreement executed by LMDC in connection with the Loan Agreement, each dated December 30, 1999, and (iii) any and all obligations, and any and all liabilities which then

7

remain outstanding, under the Citibank Business Ready Credit Agreement, dated December 30, 1999, executed by LMDC (the "Credit Agreement"). Copies of the Loan Agreement, Promissory Note, General Security Agreement and Credit Agreement are attached hereto as Exhibit 7. The parties shall cooperate, and shall engage in all actions (including, without limitation, the execution of all requisite documents) necessary, to cause CDC to assume the above-described obligations and liabilities.

3. <u>Certificate of Need Application</u>.

(a) As soon as practicable following the date hereof, the parties shall cause CDC to submit to the Department a certificate of need application (the "Application") seeking regulatory approval authorizing:

(i) CDC to be established as a diagnostic and treatment center under Article 28;

(ii) CDC to own and operate the Center; and

(iii) the transfer from LMDC to CDC of those assets of LMDC set forth on Exhibit 6 hereof (which assets relate to the current operation of the Center by LMDC and include, without limitation, the goodwill associated with the Center).

(b) The parties shall cooperate with each other with respect to the preparation and submission of the Application by CDC, which cooperation shall include, without limitation, the provision of such documents, materials and information as are reasonably required in connection therewith.

(c) The parties acknowledge and agree that the costs and expenses associated with the formation of CDC and the preparation and submission of the Application shall be borne by LMDC and Nguyen *pro rata* in accordance with the amount of their respective ownership interests in CDC.

4.   <u>Limitation on Certain Activities</u>.

(a)  Following (and including) the date hereof, and continuing until three (3) years following the earlier of: (i) the termination of this Agreement in accordance with Paragraph 8 hereof, and (ii) such time as neither Nguyen nor any Affiliate (as defined herein) continue to be an owner of CDC, neither Nguyen, nor any Affiliate, shall participate in any manner (whether as an owner, operator, director, manager, trustee, employee, medical director, consultant, contractor, service provider or otherwise), without the prior written consent of LMDC or as otherwise permitted by subparagraph (c) below, in the provision of chronic renal dialysis services to patients on an outpatient basis at any health care facility (including, without limitation, at any diagnostic and treatment center, general hospital, extension clinic, as such term is currently defined in Title 10 NYCRR § 401.1(g), or part-time clinic, as such term is currently defined in Title 10 NYCRR § 700.2(a)(22)) located in the Restricted Area (as defined herein), other than the Center as described herein.

(b)  Following (and including) the date hereof, and continuing until the earlier of (i) the termination of this Agreement in accordance with Paragraph 8 hereof, and (ii) such time as neither

9

Nguyen, nor any Affiliate, continue to be an owner of CDC, neither Nguyen, nor any Affiliate, shall enter into or take part in any arrangements, agreements, discussions or negotiations of any type (other than in connection with the arrangements described in this Agreement) relating to the participation by Nguyen or any Affiliate (whether as an owner, operator, director, manager, trustee, employee, medical director, consultant, contractor, service provider or otherwise) in the provision of chronic renal dialysis services to patients on an outpatient basis at any health care facility (including, without limitation, the health care facilities listed in subparagraph (a) immediately above) located in the Restricted Area, other than the Center as described herein.

(c)   The parties acknowledge and agree that the provisions of subparagraphs (a) and (b) immediately above shall not be deemed to prohibit or otherwise restrict Nguyen from continuing to render services at the 170 William Street, New York, New York location of NYU Downtown Hospital in the same manner in which Nguyen renders services at such location as of the date hereof.

(d)   Nguyen hereby acknowledges, represents and agrees that: (i) as of the date hereof, there are no Affiliates (such as partners or other co-owners) of Nguyen involved with, or otherwise engaged in, the provision of physician services or other health care services, and (ii) Nguyen shall notify LMDC within five (5) days following the effective date of any transaction, arrangement or other event (such as, without limitation, the formation by Nguyen of a professional partnership or professional corporation,

10

or the addition of an individual, other than Nguyen, as a partner or shareholder of such a professional partnership or professional corporation) which creates or otherwise establishes an Affiliate of Nguyen involved with, or otherwise engaged in, the provision of physician services or other health care services. For purposes of clarification, the parties acknowledge and agree that, for purposes of this Agreement, (i) the term "Affiliate" shall include, without limitation, any individual or entity which becomes an Affiliate of Nguyen following the date hereof, and (ii) any breach or misrepresentation of this Agreement with respect to an Affiliate shall be deemed to be a breach of this Agreement by Nguyen.

(e)   To the extent that one of the restrictions contained in Paragraph 4(a), Paragraph 4(b), Paragraph 5 or Paragraph 6 of this Agreement is or becomes applicable with respect to an individual or entity which is an Affiliate of Nguyen (such as, without limitation, any partner of Nguyen), and thereafter such individual or entity ceases to be an Affiliate of Nguyen for whatever reason, then the restriction shall terminate and be of no force and effect only upon the expiration of three (3) years following the date upon which such individual or entity ceases to be an Affiliate.

(f)   Neither Nguyen, nor any Affiliate, shall, as of the date hereof or at any time hereafter, be a party to, or be subject in any manner to, any agreements, arrangements or obligations which would interfere or conflict with any of the terms or provisions hereof or any of the agreements or arrangements contemplated herein.

11

5.    <u>Confidentiality</u>.

LMDC and Nguyen hereby acknowledge and agree that all documents, materials and information (the "Confidential Information") regarding or relating to the business, finances or operations of the Center, LMDC or its shareholders, or Nguyen, including, without limitation, all documents, materials and information obtained by the parties in connection with the furtherance of the provisions of this Agreement and the CDC Operating Agreement, shall be maintained by them, as applicable, on a confidential basis, and shall not, at any time following the date hereof, be used, communicated, disclosed or disseminated in any manner whatsoever, whether directly or indirectly, other than in the furtherance of the provisions of this Agreement; provided that a party may disclose Confidential Information, subject to the prompt provision by the disclosing party to the other party of written notice specifying the circumstances surrounding such disclosure, (a) to the extent that such Confidential Information becomes obtainable or otherwise ascertainable from public sources other than as a result of a breach hereof, or (b) as may be required by applicable statutes or regulations, or by any governmental agency or authority.

6.    <u>Non-Solicitation</u>.

During the term of this Agreement, and for a period of three (3) years following the expiration or termination hereof for any reason, neither Nguyen nor any Affiliate shall, in any manner, without the prior written consent of LMDC, solicit, employ,

12

interfere with, or compete for the services of, any employee, agent or contractor of LMDC, or of any entity (including, without limitation, CDC) owned or controlled by LMDC or under common ownership or control with LMDC.

7.    <u>Injunctive Relief; Scope of Restrictions</u>.

LMDC and Nguyen hereby acknowledge and agree that any breach by a party of any of the provisions of Paragraph 4, Paragraph 5 or Paragraph 6 hereof shall cause irreparable injury and damage to the other parties which cannot be readily or adequately compensated for in damages in an action at law, and that in the event of such breach a non-breaching party shall be entitled to injunctive and other equitable relief.    Resort to such injunctive or other equitable relief, however, shall not be deemed to waive or to limit in any manner any other right or remedy which a non-breaching party may have hereunder or at law with respect to such breach.    LMDC and Nguyen hereby acknowledge their mutual intent that the provisions of Paragraph 4, Paragraph 5 and Paragraph 6 hereof shall be enforced to the fullest extent permissible under the laws and public policies of each jurisdiction in which enforcement is sought, and the parties further acknowledge that said provisions are reasonably necessary for the protection of the parties. Accordingly, in the event a provision of Paragraph 4, Paragraph 5 or Paragraph 6 hereof shall be adjudicated to be invalid or unenforceable for any reason whatsoever by a court of competent jurisdiction, said provision shall be construed, with respect to the operation thereof in the particular jurisdiction in which such

13

adjudication is made, by limiting and reducing the provision so as to be enforceable to the fullest extent permissible, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of said provision in any other jurisdiction.

8.    Term and Termination.

(a)    Term.    The term of this Agreement shall commence as of the date hereof, and, unless otherwise terminated in accordance with the provisions of this Paragraph 8, shall expire upon the earlier of (i) the effective date of the expiration or termination of the CDC Operating Agreement, or (ii) such time as neither Nguyen, nor any Affiliate, maintains any ownership interest in CDC.

(b)    Mutual Termination.    This Agreement may be terminated at any time upon the mutual written consent of the parties.

(c)    Option to Terminate.    LMDC and Nguyen shall each have the right to terminate this Agreement at any time after March 31, 2003 upon the provision of at least thirty (30) days prior written notice to the other party in the event that, on or before March 31, 2003, either the Application receives a final rejection or denial by the applicable governmental authorities, or the applicable governmental authorities fail to grant final regulatory approval of the Application (for any reason whatsoever, including, without limitation, the final rejection, denial or withdrawal of the Application).    As set forth more specifically in the Escrow Agreement, in the event of such a termination the Escrow Amount shall be returned to Nguyen by the Escrow Agent.

14

(d)  Breach.  LMDC and Nguyen may terminate this Agreement immediately upon the provision of written notice in the event the other party breaches any material term, provision or representation hereof and fails to cure such breach within twenty (20) days following the provision to the breaching party by the non-breaching party of written notice identifying the nature of such breach.

(e)  Survival.  Notwithstanding any provision of this Agreement to the contrary, the provisions of Paragraph 4, Paragraph 5, Paragraph 6 and Paragraph 7 shall survive any expiration or termination of this Agreement, other than a termination pursuant to Paragraph 8(c) above.

9.  Miscellaneous.

(a)  Assignment.  This Agreement and the rights, duties and obligations created hereunder shall not be assigned or delegated by Nguyen, either voluntarily or by operation of law, without the express prior written consent of LMDC.  Any purported assignment or delegation by LMDC without such required consent shall be null and void, and of no force and effect.

(b)  Cooperation.  Each of the parties shall cooperate fully with the other in connection with the performance of their respective duties and obligations hereunder, and the parties shall employ their best efforts to resolve any dispute that may arise under or in connection with this Agreement.

(c)  Governing Law.  This Agreement shall be governed by and construed under the laws of the State of New York.

15

(d)  <u>Events Excusing Performance</u>.  No party shall be liable or responsible to another party for the satisfaction of its duties and obligations hereunder in the event of natural disasters or similar events which prevent such satisfaction by a party and over which such party has no control, for so long as such events continue, and for a reasonable period of time thereafter.

(e)  <u>Waiver</u>.  The waiver of any covenant, condition or duty hereunder by a party shall not prevent such party from later insisting upon full performance of the same.

(f)  <u>Amendment</u>.  No amendment, change or modification to the terms and provisions of this Agreement shall be binding upon a party unless in writing and executed by the duly authorized representatives of each party.

(g)  <u>Compliance with Laws</u>.  At all times during the term of this Agreement, the parties shall discharge their respective duties and obligations hereunder in accordance with all applicable federal, New York State and local statutes, regulations and ordinances, including, without limitation, to the extent applicable, those federal statutory and regulatory provisions applicable to health care fraud and abuse issues and the federal Medicare and New York State Medicaid programs.

(h)  <u>Entire Agreement</u>.  This Agreement (including, without limitation, the CDC Operating Agreement) constitutes the entire agreement between the parties in connection with the subject matter hereof, and supersedes all prior agreements, whether written or

oral, and whether explicit or implicit, which have been entered into prior to the execution hereof.

(i) <u>Notice</u>.  Any notice or other communication required or which may be given hereunder shall be in writing and shall be delivered to the address set forth on the signature page hereof, by certified or registered mail, postage prepaid and return receipt requested, or by nationally recognized overnight delivery service, and shall be deemed given if mailed, four (4) days after the date of mailing, or the next business day if sent by overnight delivery service.

(j) <u>Partial Invalidity</u>.  If any one or more of the terms, provisions, promises, covenants or conditions of this Agreement or the application thereof to any person or circumstance shall be adjudged to any extent invalid, unenforceable, void or voidable for any reasons whatsoever by a court of competent jurisdiction, each and all of the remaining terms, provisions, promises, covenants and conditions of this Agreement or their application to other persons or circumstances shall not be affected thereby and shall be valid and enforceable to the fullest extent permitted by law.

(k) <u>Headings, Titles</u>.  The headings appearing herein are for convenience and reference only and shall not be deemed to govern, limit, modify or in any manner affect the scope, meaning or intent of the provisions of this Agreement.

(l) <u>Binding Effect</u>.  Subject to the provisions contained herein, this Agreement shall be binding upon and inure to the

17

benefit of the parties hereto and upon their respective successors and permitted assigns.

(m)  Counterparts.  This Agreement may be executed in one or more counterparts, each of which when so executed shall be deemed to be an original, but all of which taken together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Master Agreement as of the date first set forth above.

Nguyen:   DANG DUNG NGUYEN, M.D.

By:_____
     Name:
     Title:

LMDC:   LOWER MANHATTAN DIALYSIS CENTER, INC.

By:_____
     Robert Matalon, M.D.
     President

18

# EXHIBIT 3

## ASSIGNMENT AND ASSUMPTION OF MEMBERSHIP INTEREST

ASSIGNMENT AND ASSUMPTION AGREEMENT ("Agreement"), made and entered into as of the 1st day of May, 2001, by and between Lower Manhattan Dialysis Center, Inc. (the "Assignor"), having an address at 323 East 34th Street, New York, New York 10016, and Dang Dung Nguyen, M.D. (the "Assignee"), an individual having an address at 7 Aspen Court, Warren, New Jersey 07059.

### W I T N E S S E T H:

WHEREAS, Assignor is the record owner of a one hundred percent (100.0%) membership interest in CHINATOWN DIALYSIS CENTER, L.L.C., a New York limited liability company (the "Company");

WHEREAS, pursuant to that certain Master Agreement by and between Assignor and Assignee, of even date herewith (the "Master Agreement"), Assignor agreed to assign a 10.0% membership interest (the "Interest") in the Company to Assignee; and

WHEREAS, the parties desire to effect such assignment pursuant to the following terms and provisions of this Agreement.

NOW, THEREFORE, for good and valuable consideration, receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.    Assignor represents and warrants to Assignee that the Interest is fully owned by Assignor free and clear of any and all liens, claims, charges and encumbrances of any nature whatsoever and there are no legal actions, suits, litigations or other legal, administrative or other governmental proceedings pending, or, to the actual knowledge of Assignor, threatened, against all or any portion of the Interest.

2.    Assignor hereby sells, assigns and transfers all of its right, title and interest in and to the Interest, including, without limitation, any and all rights, duties and liabilities accrued with respect to the Interest prior to the date hereof.

3.    Assignee hereby accepts assignment of the Interest. It is intended that Assignee shall possess an interest in the Company in the place and stead of Assignor to the extent of the Interest herein assigned.

4.    Simultaneously with the execution of this Agreement, Assignee has delivered to Assignor a check in the amount of One Hundred ($100.00) Dollars payable to Assignor, as full and complete payment for the assignment of the Interest hereunder.

5.    The parties acknowledge and agree that, as of the date hereof, their respective membership interests in the Company, including, without limitation, the Interest herein assigned, shall be subject to the terms and provisions of that certain Limited Liability Operating

Agreement, of even date herewith, executed simultaneously with this Agreement (collectively, the "Operating Agreement")

      6.    The parties acknowledge that this Agreement is made subject to the terms and conditions of the Master Agreement and the Operating Agreement.

      7.    Subject to the Master Agreement and the Operating Agreement, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective executors, legal representatives, successors and assigns.

      8.    This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

      9.    This Agreement may be signed in one or more counterparts, each of which shall be deemed an original and the same instrument.

      IN WITNESS WHEREOF, Assignor and Assignee acknowledge their agreement to the foregoing terms and provisions of this Agreement, and have duly executed this instrument as of the date first set forth above.


Assignor:    LOWER MANHATTAN DIALYSIS CENTER, INC.


By: _____
    Robert Matalon, M.D.
    President



Assignee:   _____
    Dang Dung Nguyen, M.D.

# EXHIBIT 4

**Arthur Katz**

| | |
|---|---|
| **From:** | Arthur Katz |
| **Sent:** | Thursday, June 28, 2007 5:44 PM |
| **To:** | 'John Manfredonia' |
| **Subject:** | RE: Lantz Doc Request |



requested
cuments 62807.doc

Mr. Manfredonia:

In response to your letter of May 22, which you forwarded to me on June 12, I have been advised by our client that the attached listing of financial statements and tax returns has been sent to you today. Thank you for your patience in waiting for these documents to be gathered.

With respect to the other documents that you have requested, I request that you hold the request in abeyance until you have finished your review of the documents being sent to you, so that we and the companies can more easily focus on the exact materials you would like to receive, rather than our attempting to gather all corporate records since inception for each of the companies.

Lastly, if you have questions concerning the financial and tax records being sent to you, please furnish the same through me for response.

Thank you

Arthur A. Katz
Otterbourg, Steindler, Houston & Rosen, P.C.
230 Park Avenue
New York, New York 10169-0075
telephone no: (212) 905-3629
switchboard no: (212) 661-9100
direct fax no: (917) 368-7148
mail room fax no: (212) 682-6104 or 6862
email: akatz@oshr.com
website: http://www.oshr.com

NOTICE: This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential or exempt from disclosure under applicable law. If you are not the intended recipient of this message, or the employee or agent responsible for delivering this message to the intended recipient, you are advised that any dissemination, distribution or copying of this message or acting on the information contained in this message, may be a violation of applicable law and is strictly prohibited. If you have received this message in error, please notify the sender immediately, by replying to this message.

| ENTITY | DOCUMENTS REQUESTED | STATUS |
|---|---|---|
| Lower Manhattan Dialysis Center, Inc | 2006 US Tax Return | Sent 6/2807 |
| | 2005 US Tax Return | Sent 6/28/07 |
| | 2004 US Tax Return | Sent 6/28/07 |
| | 2006 NYS Tax Return | Sent 6/28/07 |
| | 2005 NYS Tax Return | Sent 6/28/07 |
| | 2004 NYS Tax Return | Sent 6/28/07 |
| | 2006 Financial Statments | Sent 6/28/07 |
| | 2005 Financial Statements | Sent 6/28/07 |
| | 2004 Financial Statements | Sent 6/28/07 |
| Lantz-Matalon Associates, Inc. | 2006 US Tax Return | Sent 6/28/07 |
| | 2005 US Tax Return | Sent 6/28/07 |
| | 2004 US Tax Return | Sent 6/28/07 |
| | 2006 NYS Tax Return | Sent 6/28/07 |
| | 2005 NYS Tax Return | Sent 6/28/07 |
| | 2004 NYS Tax Return | Sent 6/28/07 |
| | 2006 Financial Statments | N/A |
| | 2005 Financial Statements | N/A |
| | 2004 Financial Statements | N/A |
| L-M Dialysis Corporation | 2006 US Tax Return | Sent 6/28/07 |
| | 2005 US Tax Return | Sent 6/28/07 |
| | 2004 US Tax Return | Sent 6/28/07 |
| | 2006 NYS Tax Return | Sent 6/28/07 |
| | 2005 NYS Tax Return | Sent 6/28/07 |
| | 2004 NYS Tax Return | Sent 6/28/07 |
| | 2006 Financial Statments | Sent 6/28/07 |

| | | |
|---|---|---|
| | 2005 Financial Statements | Sent 6/28/07 |
| | 2004 Financial Statements | Sent 6/28/07 |
| Lantz-Matalon Chinatown Associates, Inc. | 2006 US Tax Return | Sent 6/28/07 |
| | 2005 US Tax Return | Sent 6/28/07 |
| | 2004 US Tax Return | Sent 6/28/07 |
| | 2006 NYS Tax Return | Sent 6/28/07 |
| | 2005 NYS Tax Return | Sent 6/28/07 |
| | 2004 NYS Tax Return | Sent 6/28/07 |
| | 2006 Financial Statements | N/A |
| | 2005 Financial Statements | N/A |
| | 2004 Financial Statements | N/A |

# EXHIBIT 5

LOWER MANHATTAN DIALYSIS CENTER, INC.
AND SUBSIDIARY

CONSOLIDATED FINANCIAL STATEMENTS
AND AUDITOR'S REPORT

DECEMBER 31, 2006

LOEB & TROPER

**LOWER MANHATTAN DIALYSIS CENTER, INC.**
**AND SUBSIDIARY**

**TABLE OF CONTENTS**

**Independent Auditor's Report**

**Exhibit**

    **A   -   Consolidated Balance Sheet**

    **B   -   Consolidated Statement of Operations**

    **C   -   Consolidated Statement of Comprehensive Income**

    **D   -   Consolidated Statement of Cash Flows**

**Notes to Financial Statements**

LMDC-CON-FS06.DOC

**LOEB & TROPER**

 LOEB & TROPER

**Independent Auditor's Report**

**Board of Directors**
**Lower Manhattan Dialysis Center, Inc.**
  **and Subsidiary**

We have audited the accompanying consolidated balance sheet of Lower Manhattan Dialysis Center, Inc. and Subsidiary (the "Center") as of December 31, 2006, and the related consolidated statements of operations, comprehensive income, and cash flows for the year then ended. These financial statements are the responsibility of the Center's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Center's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Lower Manhattan Dialysis Center, Inc. and Subsidiary as of December 31, 2006, and the results of their operations and their cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.

*Loeb Troper*

April 6, 2007

**Auditors and Consultants**
*Serving the Health Care & Not-for-Profit Sectors*

655 Third Avenue, 12th floor, New York, NY 10017
(212) 867-4000 / Fax (212) 867-9810 / *www.loebandtroper.com*

LOWER MANHATTAN DIALYSIS CENTER, INC.
AND SUBSIDIARY

NOTES TO FINANCIAL STATEMENTS

DECEMBER 31, 2006

## NOTE 1 - NATURE OF OPERATIONS

The financial statements consist of Lower Manhattan Dialysis Center, Inc. (LMDC) and Chinatown Dialysis Center, LLC (CDC). Both LMDC and CDC (the Centers) operate as outpatient dialysis facilities.

LMDC provides life-sustaining hemodialysis to approximately one hundred and thirty-two patients in the New York City metropolitan area generally three times per week. In addition, LMDC provides dialysis treatment to twelve homebound patients on a daily basis. The Center's primary sources of revenues are fees paid by Medicare and other third-party payors.

LMDC made an election under Section 1372 of the Internal Revenue Code and Section 210 of the New York State tax law to be treated as an S Corporation. The effect of a valid election by the Company is to subject the shareholders to provisions which provide for the federal and state taxation of the Company's taxable income to the shareholders and not to the Corporation. The Corporation does pay a minimum state tax and local corporate taxes.

CDC provides life-sustaining hemodialysis to approximately one hundred and fifty patients in the Chinatown area generally three times per week. CDC's primary sources of revenues are fees paid by Medicare and other third-party payors.

CDC is owned ninety percent by LMDC and ten percent by a minority interest.

## NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

*Basis of accounting* - The financial statements are prepared on the accrual basis.

*Cash and cash equivalents* - Investments in money market funds are considered to be cash equivalents.

*Investments* - Investments are stated at fair market value.

*Inventories* - Inventories consisting of medical supplies are valued at the lower of cost or market and are determined on the first-in, first-out (FIFO) basis.

*Fixed assets* - Fixed assets are stated at cost. Depreciation of furniture and equipment is provided on the accelerated method over a three- to seven-year period. Leasehold improvements are amortized on the straight-line method over nineteen years.

-continued-

LOEB & TROPER

# EXHIBIT 6

AGREEMENT OF SUBLEASE, made as of the ___31st___ day of ___December___, 2002, between Lantz-Matalon Chinatown Associates, Inc., ("Landlord"), a New York Corporation, having an office at 323 East 34th Street and Chinatown Dialysis Center, LLC., ("Tenant"), a New York Corporation, having an office at 323 East 34th Street, New York, N.Y. 10016.

## W I T N E S S E T H :

WHEREAS, by Agreement of Lease dated (the "Prime Lease"), by and between 150 Lafayette Street Property Investments Co. ("Prime Landlord") and Lantz-Matalon Chinatown Associates, Inc., ("Landlord"), Prime Landlord leases certain premises (the "Premises") in the building known as 9-11 Crosby Street, New York, New York, (the "Building") which Premises are more particularly described in the Prime Lease; and

WHEREAS, Landlord desires to sublease the Premises to Tenant and Tenant desires to hire the same from Landlord.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and for other good and valuable consideration, the parties agree as follows:

1. <u>Subleasing of Premises</u>. Subject to Article 8 of the Prime Lease (wherein Prime Landlord consents to the sublease herein), Landlord hereby subleases to Tenant and Tenant hereby hires from Landlord the Premises, upon and subject to all of the terms, covenants, rentals and conditions hereinafter set forth.

2. <u>Term</u>. The term (the "Term") of this Sublease shall commence on ___April 1, 2003___, (the "Commencement Date") and shall expire at midnight on the day prior to the termination of the Prime Lease (the "Expiration Date"), unless sooner terminated as hereinafter provided, subject, however, to Tenant's right to terminate this Sublease by giving Landlord at least sixty (60) days' notice of this election to so terminate this Sublease.

3. <u>Base Rent</u>.

(a)  Tenant shall pay to Landlord, in lawful money of the United States which at the time shall be legal tender in payment of all debts and dues, public and private, an initial fixed annual rent (the "Base Rent") of  REDACTED  and REDACTED  REDACTED  in equal monthly installments of  REDACTED

(b)  The annual Base Rent shall be increased each year as set forth in Schedule A, attached hereto.

1

4. Additional Rent.

(a)  Tenant shall pay to Landlord as additional rent hereunder, within ten (10) days after notice and demand, one hundred percent (100%) of any sums of money, costs, charges, adjustments, or additional rent payable by Landlord to Prime Landlord under the Prime Lease for or in connection with the Premises or the Building by reason of Tenant's occupancy, use or manner of use thereof.

(b)  If, as and when received, Landlord shall furnish to Tenant copies of any and all statements, invoices and/or notices received by Landlord from Prime Landlord with respect to additional rent payable by Tenant hereunder.

(c)  All amounts payable by Tenant to Landlord pursuant to this Sublease shall be deemed to constitute rent and, in the event of any non-payment thereof, Landlord shall have all of the rights and remedies provided herein, in the Prime Lease or in law or at equity for non-payment of rent.

(d)  In addition to the foregoing, Tenant will be responsible for the payment of any utilities supplied to the Premises which would be otherwise payable by Landlord.

5. Use.  Tenant shall use and occupy the Premises for the purposes permitted under the Prime Lease and for no other purpose.

6. Subordination to and Incorporation of Prime Lease.

(a)  This Sublease is in all respects subject and subordinate to the terms and conditions of the Prime Lease and, except as otherwise expressly provided in this Sublease, the terms, provisions, covenants, stipulations, conditions, rights, obligations, remedies and agreements of the Prime Lease are incorporated in this Sublease by reference and made a part hereof as if herein set forth at length, and shall, as between Landlord and Tenant (as if they were the landlord and tenant, respectively, under the Prime Lease), constitute the terms of this Sublease except to the extent that they are inapplicable, inconsistent with or modified by the terms of this Sublease.

(b)  In the event of a default by Landlord as tenant under the Prime Lease resulting in the termination thereof, Tenant hereunder shall, at the option of the Prime Landlord, attorn to and recognize Prime landlord as Landlord hereunder and shall promptly upon the Prime Landlord's request, execute and deliver all instruments necessary or appropriate to confirm such attornment an recognition.

2

7.  <u>Modification of Prime Lease</u>.  For the purposes hereof the terms of the Prime Lease are subject to the following modification:

In all provisions of the Prime Lease requiring the approval or consent of Prime Landlord, Tenant shall be required to obtain the approval or consent of both Prime Landlord and Landlord. In all provisions of the Prime Lease requiring that notice be given to Prime landlord, Tenant shall be required to give notice to both the Prime Landlord and Landlord.

8.  <u>Tenant's Obligations</u>.  Except as otherwise specifically provided herein, all acts to be performed and all of the terms, provisions, covenants, stipulations, conditions, rights, obligations, remedies and agreements to be observed by, and inuring to the benefit of, Landlord as tenant under the Prime Lease, shall be performed, and observed by, and shall inure to the benefit of, Tenant, and Tenant's obligations shall run to Landlord or the Prime Landlord, as landlord may determine to be appropriate or required by the respective interests of Landlord and Prime Landlord. Tenant shall indemnify Landlord against and hold landlord harmless from all liabilities, obligations, damages, penalties, claims, costs, expenses and liabilities (including, but not limited to, reasonable attorneys' fees and disbursements) paid, suffered or incurred by Landlord as a result of the non-performance or non-observance by Tenant, Tenant's agents, contractors, employees, invitees or licensees of any such terms, provisions, covenants, stipulations, conditions, obligations and agreements contained in the Prime Lease.

9.  <u>Landlord's Obligations</u>.  Anything contained in this Sublease or in the Prime Lease to the contrary notwithstanding, Landlord shall have no responsibility to Tenant for, and shall not be required to provide, any of the services or make any of the repairs or restorations that Prime Landlord has agreed to make or provide, or cause to be made or provided, under the Prime Lease and Tenant shall rely upon and look solely to Prime Landlord for the provision or making thereof. If Prime Landlord shall default in the performance of any of its obligations under the Prime Lease or if Tenant wishes to file a protest or dispute any matter or thing Landlord has the right to protest or dispute as tenant under the Prime Lease, Tenant shall have the right, at Tenant's sole cost and expense, and in the name of Landlord, to file any such protest and/or to make, demand or institute any appropriate action or proceeding against Prime Landlord for the enforcement of its obligations. Landlord agrees that it shall sign such demands, pleadings and/or other papers and shall otherwise cooperate with Tenant, as may be reasonably required or necessary, to enable Tenant to proceed in Landlord's name to enforce the obligations of Prime Landlord, provided that Tenant shall indemnify Landlord against, and hold Landlord harmless from, any and all loss, cost, damage, expense, penalty or liability (including, but not limited

to, reasonable attorneys' fees and disbursements) incurred by Landlord by reason of the prosecution by Tenant of any such proceeding or action or the filing of any such protest. Tenant shall not make any claim against Landlord for any damage which may arise, nor shall Tenant's obligations hereunder be impaired, by reason of (i) the failure of Prime Landlord to keep, observe or perform its obligations pursuant to the Prime Lease, or (ii) the acts or omissions of Prime Landlord or any of its agents, contractors, servants, employees, invitees or licensees.

10. <u>Landlord's Remedies</u>. In the event that Tenant shall be in default of any covenant, term or condition of, or shall fail to honor any obligation under this Sublease, Landlord, on giving the notice required by the Prime Lease (as modified pursuant to Article 15 hereof) and subject to the right, if any, of Tenant to cure any such default as may be provided in the Prime Lease (as modified pursuant to Article 15 hereof), shall have available to it all of the remedies available to Prime Landlord under the Prime Lease in the event of a like default or failure on the part of Landlord as tenant thereunder. Such remedies shall be in addition to all other remedies available to landlord at law or in equity.

11. <u>Broker</u>. Tenant represents and warrants to Landlord that it has not dealt with any broker in connection with this Sublease. Tenant shall indemnify landlord against, and hold Landlord harmless from, any claim of, or Liability to, any broker who shall have dealt with Tenant in connection with this transaction and Sublease.

12. <u>Indemnification of Landlord</u>. Tenant agrees to indemnify Landlord against and hold Landlord harmless from any and all loss, cost, damage, expense or liability (including, but not limited to, reasonable attorneys' fees and disbursements) incurred by Landlord by reason of (i) any injuries to persons or damages to property occurring in, on or about the Premises, other than those arising out of the negligent or wrongful acts of Landlord, (ii) any work or thing whatsoever done, or any condition created by Tenant in, on or about the Premises or the Building, or (iii) any act or omission of Tenant, its agents, contractors, servants, employees, invitees or licensees.

13. <u>Consents</u>. Landlord's refusal to consent to or approve any matter or thing, whenever Landlord's consent or approval is required under this Sublease or under the Prime Lease, as incorporated herein, shall be deemed reasonable if Prime Landlord has refused or failed to give its consent or approval to such matter or thing. In any instance when the Prime Landlord's consent, approval or satisfaction is required or believed by Sublessor to be required, Landlord, promptly after Tenant's demand, shall request such consent, approval or satisfaction and exercise its best efforts to obtain the same for Tenant (without thereby being required to commence any action or proceeding, expend any

4

monies or incur any material expenses).

14. <u>Condition of the Premises</u>. Tenant acknowledges that it has examined and inspected the Premises, is fully familiar with the physical condition thereof and agrees to take possession of the Premises "as is". Landlord has not made and does not make any representations or warranties as to the physical condition, the use to which the Premises may be put, or any other matter or thing affecting or relating to the Premises, except as specifically set forth in this Sublease (excluding anything in the Prime Lease incorporated herein by reference). Landlord shall have no obligation whatsoever to alter, improve, decorate, repair or otherwise prepare the Premises for Tenant's occupancy.

15. <u>Time Limits</u>. The parties agree that the time limits set forth in the Prime Lease for the giving of notices, making demands, performance of any act, condition or covenant, or the exercise of any right, remedy or option are modified for the purposes of this Sublease by lengthening or shortening the same in each instance by three (3) business days, as the case may be, so that notices may be given, demands made, any act, condition or covenant performed and any right or remedy hereunder exercised by Landlord or Tenant, as the case may be, within the time limits relating thereto contained in the Prime Lease. Landlord and Tenant shall, no later than three (3) business days after receipt thereof, furnish to each other a copy of each notice, demand or other communication received from Prime Landlord with respect to the Premises.

16. <u>Assignment and Subletting</u>. Tenant, for itself, its successors and assigns, expressly covenants that it shall not assign, whether by operation of law or otherwise, or pledge or otherwise encumber this Sublease, or sublet all or any part of the Premises without obtaining the prior written consent of Landlord.

17. <u>Notices</u>. All notices, demands, requests or other communications hereunder shall be in writing and shall be sent by registered or certified mail, return receipt requested, addressed to the parties at their respective addresses set forth above, or at such other address which either party may hereafter designate for such purpose by a written notice given as herein provided.

18. <u>Sublease Conditional Upon Certain Consents</u>. Landlord and Tenant each acknowledge and agree that this Sublease is subject to Landlord's obtaining the consent hereto of Prime Landlord in accordance with the terms of the Prime Lease.

19. <u>Insurance</u>. Tenant shall furnish to Prime Landlord and Landlord the insurance required by of the Prime Lease, which insurance shall also name Landlord as a party insured thereunder.

5

20. <u>Miscellaneous</u>.

(a)   This Sublease may not be extended , renewed, terminated or otherwise modified except by an instrument in writing signed by the party against whom enforcement of any such modification is sought.

(b)   It is understood and agreed that all understandings and agreements heretofore had between the parties hereto are merged in this Sublease, which alone fully and completely expresses their agreement, and that the same is entered into after full investigation, neither party relying upon any statement, representation or warranty made by the other not embodied in this Sublease.

(c)   The paragraph headings appearing herein are for purposes of convenience only and are not deemed to be a part of this Sublease.

IN WITNESS WHEREOF, this Sublease been duly executed as of the day and year first above written.

LANTZ-MATALON CHINATOWN
ASSOCIATES, INC.

By: _____

CHINATOWN DIALYSIS CENTER, LLC.

By: _____

6

SCHEDULE OF RENT PAYMENTS

Sublease Agreement between Chinatown Dialysis Center, LLC., and
Lantz-Matalon Chinatown Associates, Inc.

| Lease Year | Annual Rent |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | REDACTED |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | REDACTED |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | REDACTED |
| 18 | |

7

## CONSENT TO SUBLEASE

150 Lafayette Street Property Investments Co. ("Lessor"), entered into a Lease for certain space at 9-11 Crosby Street, New York, New York 10013 ("Space") with Lantz-Matalon Chinatown Associates, Inc. ("Lessee"), dated October 22, 1998.

Lessee desires to Sub-Lease the Space to Chinatown Dialysis Center, L.L.C., in accordance with Article 8 of the Rider to the Lease. A copy of the proposed Sub-Lease is attached to this document.

In accordance with the terms of Article 8 of the Rider to the Lease, the parties agree with the above statements, and the Lessor consents to the Sub-Lease.


_____           2/8/02
150 Lafayette Street Property Investments Co.      _____
Name:  Dunnie Lai, Manager                          Date


_____           2/5/02
Lantz-Matalon Chinatown Associates, Inc.            _____
Name:  Robert Matalon, M.D. President               Date


_____           2/5/02
Chinatown Dialysis Center, L.L.C.                   _____
Name:  Robert Matalon, M.D. President               Date

# EXHIBIT 7

**Arthur Katz**

---

| | |
|---|---|
| **From:** | Arthur Katz |
| **Sent:** | Tuesday, June 12, 2007 5:33 PM |
| **To:** | 'Jerome A. Deener' |
| **Cc:** | manfredonia@verizon.net; Ronald S. Greenberg (RGreenberg@KRAMERLEVIN.com); Miriam Sinitzky (administrator@lowermanhattandialysis.com) |
| **Subject:** | Lantz-Matalon Chinatown Associates |

   

KL3-#2595070-v5-    KL3-#2594862-v10    KL3-#2595151-v7-    DOCS-#520876-v2-
Notice_of_Peti...    -Surrender_Agr...    Escrow_Agreeme...    Wood-_150_Lafa...

Mr. Deener:

As I indicated in our telephone conversation this morning, I am sending to you, as attachments to this email, copies of the most recent versions of various documents prepared in connection with the proposed disposition of the company's lease. Such documents are complete except that contact information concerning the landlord has been redacted from the documents. The attorney representing the company n the transaction is Ronald Greenberg at the Kraemer Levin law firm in New York City. Mr. Levin's telephone number is (212) 715-9399. If you determine to contact Mr. Greenberg, I would appreciate if you would timely advise me so that I can be kept aware of the matters being discussed.

**REDACTED**

**REDACTED**

**REDACTED**

Regards
-----------
Arthur A. Katz
Otterbourg, Steindler, Houston & Rosen, P.C.
230 Park Avenue
New York, New York 10169-0075
telephone no: (212) 905-3629
switchboard no: (212) 661-9100
direct fax no: (917) 368-7148
mail room fax no: (212) 682-6104 or 6862
email: akatz@oshr.com
website: http://www.oshr.com
-----------
NOTICE: This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential or exempt from disclosure under applicable law. If you are not the intended recipient of this message, or the employee or agent responsible for delivering this message to the intended recipient, you are advised that any dissemination, distribution or copying of this message or acting on the information contained in this message, may be a violation of applicable law and is strictly prohibited. If you have received this message in error, please notify the sender immediately, by replying to this message.
-------------------------------
Pursuant to U.S. Treasury Department Circular 230, we are informing you that any U.S. federal tax advice contained in this communication (including any attachments hereto) was not intended or written to be used, and it cannot be used, by any taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer. In addition, if any such tax advice

is used or referred to by others in promoting, marketing or recommending any partnership or other entity, investment plan or arrangement (which should be assumed to be the case by a taxpayer that is not our client with respect to the subject matter of the communication), then (i) the advice should be construed as written in connection with the promotion or marketing by others of the transaction(s) or matter(s) addressed in this communication and (ii) the taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.