UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LOWER MANHATTAN DIALYSIS CENTER, INC.  :
L-M DIALYSIS CORPORATION, LANTZ-        :
MATALON CHINATOWN ASSOCIATES, INC.      :
and CHINATOWN DIALYSIS CENTER,          :
L.L.C.,                                 :
                                        :   07 Civ. 06903 (DLC)
                 Plaintiffs             :
                                        :
          -against-                     :
                                        :
JOHN P. LANTZ, M.D. and MARIE LANTZ,    :
                                        :
                 Defendants             :
                                        :

**DECLARATION OF MARIE LANTZ**

   Pursuant to 28 U.S.C. § 1746, Marie Lantz declares under penalty of perjury:

   1.   I am a named Defendant in this action, and the wife of the Defendant, John P. Lantz, M.D. I am fully familiar with the matters stated in this Declaration.

   2.   I signed the document entitled "Meeting Held Sunday, May 20, 2007," a copy of which is attached to my Declaration as Exhibit A. Since I do not agree with the characterization that is made of Exhibit A of the Plaintiffs' Complaint, I shall refer to it in my Declaration as the "Subject Document."

3. On Sunday, May 20, 2007, at approximately 12:00 p.m., I was at my home at 28 Mackay Drive, Tenafly, New Jersey when I received a telephone call there from Robert Matalon, M.D. ("Dr. Matalon"), who notified me that he was coming over to my house.

4. Dr. Matalon did not notify me as to the purpose of why he was coming over to my house. I never received any notice that any sort of shareholder's meeting was to be held on Sunday, May 20, 2007, or that any sort of business affairs were to be discussed then.

5. I agreed that Dr. Matalon could come over to my house because I assumed at that time that Dr. Matalon wanted to come over and visit my husband who was seriously ill.

6. My husband has been seriously ill for several years. He has had strokes that have produced a medical condition diagnosed as bradykinesia. Consequently, Dr. Lantz is immobile and cannot move on his own. My husband also had pneumonia, which resulted in the insertion of a tracheotomy which prevents him from speaking. My son, Pericles Lantz, M.D. and my daughter, Athena Lantz, M.D., are both physicians who have stopped working in order to care for their father around-the-clock so that he may be at home instead of in a hospital. My husband has round-the-clock medical care in a room in our house which is equipped like a hospital room. I believe that my husband hears and understands what is said in his presence, but he is unable to

communicate at the present time. Therefore, I am unable to present an Affidavit or Declaration by him.

7. My husband and Dr. Matalon have known each other for more than thirty years. At the time of the telephone call that I received on Sunday, May 20, 2007 at approximately noon, Dr. Matalon had not visited my husband in his home in approximately thirty-five years. When I received Dr. Matalon's telephone call on May 20, 2007, I agreed that he could come over to my house, because I assumed that he was coming to visit my husband.

8. On May 20, 2007, at approximately 1:30 p.m., Dr. Matalon arrived at my house.

9. Upon his arrival, I showed Dr. Matalon to the room where my husband was lying immobile in his hospital bed, with the tracheotomy in place in his throat. Dr. Matalon spent less than one minute in the room where my husband was. Dr. Matalon did not say anything to my husband. The only words that Dr. Matalon stated in my husband's presence were: "Hi John." Photographs that were taken on September 4, 2007, but that are representative of my husband's medical condition on May 20, 2007, are attached to my Declaration as Exhibit B.

10. From the room where my husband was lying, Dr. Matalon proceeded to the other side of my house where he sat down at my kitchen table with my son, my daughter and me.

11. After Dr. Matalon sat down with my son, my daughter and me at our kitchen table, Dr. Matalon presented the Subject Document (<u>Exhibit A</u>) to me for my signature. The Subject Document had already been signed by Dr. Matalon when he presented it at my kitchen table.

12. The Subject Document states that a "Meeting" was "Held" on Sunday, May 20, 2007. To my understanding, a "meeting" is "held" when people convene to discuss a subject that they knew would be discussed. However, prior to Dr. Matalon presenting me with the Subject Document at my kitchen table on Sunday, May 20, 2007, I did not know that any of the matters that were stated on the document would be discussed on that occasion.

13. Paragraph 10 of the Complaint characterizes the Subject Document as a "Shareholders Agreement." I did not know that Dr. Matalon was coming to my house for a Shareholders Meeting.

14. Paragraph 10 of the Complaint also refers to my adult children being present at the so-called "Meeting" and giving their approval to the Subject Document. Prior to Dr. Matalon's Sunday visit to my house on May 20, 2007, Dr. Matalon's attorneys were communicating with my attorneys about the landlord-tenant matter that is referenced in the Subject Document. My attorneys were not present when the Subject Document was brought to my house on Sunday, May 20, 2007,

because I did not know that Dr. Matalon was coming with what the Complaint would later refer to as a "Shareholder's Agreement."

15. The document also states that the persons that were "present" at the "meeting" were: "Robert Matalon, John P. Lantz, Marie Lantz." (Exhibit A). To my understanding, a person is "present" at a meeting when they are there. However, my husband was not present when Dr. Matalon presented the Subject Document to me at my kitchen table. At all times when Dr. Matalon was in my kitchen on Sunday, May 20, 2007, my husband was immobile in the bedroom that is on the other side of our house.

16. After I signed the Subject Document, I showed it to my attorneys. Consequently, on July 23, 2007, one of my attorneys forwarded a letter of that date to Dr. Matalon's attorney, Arthur Katz, Esq., a copy of which is attached to this Declaration as Exhibit C. In that letter, my attorney notified Mr. Katz that if my demands were not met by July 27, 2007, then I would file a lawsuit in the Superior Court of New Jersey.

17. On July 27, 2007, my attorney received Mr. Katz's response, which stated: "Mindful of the short deadline contained in your letter to me of July 20, attached to this email is our and our clients' response." (Exhibit D). Mr. Katz's response included a copy of the Summons and Verified Complaint that he filed against my husband and myself in the Supreme Court of the State of New York.

18. During the thirty or more years that my husband and Dr. Matalon were in business together, their various business entities paid for or reimbursed their health insurance coverage. This has come to be a very important matter in light of my husband's medical condition. Following the filing of the lawsuit in the Supreme Court of the State of New York, I was notified by Dr. Matalon's associate, Miriam Sinitzky, that my husband's businesses would not pay for or reimburse his health insurance premiums.

19. In paragraph 37 of Plaintiffs' Complaint, it is alleged that my son and I "took it upon themselves to appear at Plaintiffs' business premises and interfered with an employees' celebration." The celebration that is referred to was a retirement party for my husband's secretary of many years, Haydee Torres. Since my husband's medical condition prevented him from attending his secretary's retirement party, my son and I attended on his behalf. I do not know what the Plaintiffs' Complaint is referring to as "interference." I do know that after my son and I attended her retirement party, Haydee Torres sent us a "Thank You" card, a copy of which is attached to this Declaration as <u>Exhibit E</u>.

20. I see that in paragraph 42 of the Complaint, Plaintiff is seeking a declaration from this Court that the so-called "Shareholder's Agreement" is valid, operative and enforceable.

6

The so-called "Shareholder's Agreement" that is referred to in paragraph 42 of the Complaint appears to be the Subject Document, (<u>Exhibit A</u>). According to its terms, the Document states that the following is its subject matter: "Subject Matter Relating to Lower Manhattan Dialysis Center (LMDC), L-M Dialysis Corporation (L-M), and Lantz-Matalon Chinatown Associates." It was to be signed by Dr. Matalon as shareholder of LMDC, L-M, and Lantz-Matalon Chinatown Associates, and by me "as attorney-in-fact for John P. Lantz, shareholder, LMDC, L-M, Lantz-Matalon Associates." Neither its stated subject matter, nor its signature lines, makes any reference to Chinatown Dialysis Center. To my understanding, Chinatown Dialysis Center, L.L.C. is not a party to the Subject Document which is referred to as the "Shareholder's Agreement" in the Complaint for a declaratory judgment.

21. The Subject Document which the Complaint refers to as "the Shareholder's Agreement" purports to state that:

> "a) four million dollars will be set aside **in LMDC** for the relocation, renovation and re-equipping of Chinatown Dialysis Center and related costs."

(<u>Exhibit A</u>, emphasis added).

22. The Complaint names the Plaintiffs as being Lower Manhattan Dialysis Center, Inc., L-M Dialysis Corporation, Lantz-Matalon Chinatown Associates, Inc. and Chinatown Dialysis

7

center, L.L.C. I do not agree that Chinatown Dialysis Center, L.L.C. should be a named plaintiff, since Chinatown Dialysis Center, L.L.C. is not a party to the Subject Document that Plaintiffs seek to enforce (Exhibit A).

23. To my understanding, my husband was an equal fifty percent shareholder together with Dr. Matalon in Lower Manhattan Dialysis Center, Inc., L-M Dialysis Corporation, and Lantz-Matalon Chinatown Associates, Inc. To my understanding, Lower Manhattan Dialysis Center, Inc. ("LMDC") was the only member of Chinatown Dialysis Center, L.L.C. ("CDC"). However, paragraph 6 of the Complaint states that LMDC is a ninety percent member in CDC, and that the other ten percent is owned by a physician. These statements in paragraph 6 of the Complaint were the first notice I had that anyone else besides LMDC was an owner of CDC.

24. CDC was organized before my husband became medically incapable of communicating. At no time did my husband tell me that anyone else besides LMDC was a member of CDC. Whenever we discussed ownership of the businesses, my husband always referred to the businesses as being owned by himself and Dr. Matalon, and he never mentioned that anyone else besides LMDC was an owner of CDC. My husband and I were present when CDC opened for business, and both of us were introduced to the various staff, but no one was introduced us as being a co-owner of CDC.

25. Paragraph 3 of the Declaration of Miriam Sinitsky states that at the outset, CDC was wholly owned by LMDC, but that on May 1, 2001, "LMDC sold and transferred to Dang Dung Nguyen M.D. ("Dr. Nguyen") a ten percent membership interest in CDC." I do not know whether the reference to a sale and transfer of a "membership interest" refers to an assignment of profits and losses or whether it entitles Dr. Nguyen to become a member of CDC.

26. I do not agree that Dr. Nguyen is a member of CDC. However, my husband's medical condition prevents him from communicating. Therefore, I have no way of presenting whatever evidence my husband may possess to admit or deny that Dr. Nguyen is a member of CDC.

27. Since Dr. Nguyen was not named in the Complaint as a member of CDC, I had no way to investigate the residence of any other ten percent member as referred to in paragraph 6 of the Complaint. I tried to investigate the ownership of CDC by engaging an accountant, Dennis Stamm, CPA, to inspect the records of LMDC, including the Operating Agreement of CDC. This request was made of Miriam Sinitzky at LMDC on July 30, 2007, and it was not granted by her. A copy of Dr. Matalon's attorney's letter of August 1, 2007, imposing conditions upon our access to corporate records, is attached to my Declaration as <u>Exhibit F</u>. Following Ms. Sinitzky's refusal to grant access

9

to corporate records, our Notice of Removal was prepared on July 31, 2007, and filed on August 1, 2007.

28. Apart from my questioning of whether Dr. Nguyen is a member of CDC, I am advised that my legal position is that CDC is a nominal or formal party, as stated in the accompanying Memorandum of Law that is being submitted on behalf of myself and my husband.

29. I declare under the penalty of perjury that the foregoing is true and correct. Executed this 4th day of September, 2007, at Tenafly, New Jersey.

                                                                               _____
                                                                                   Marie Lantz